Filed 3/9/23  In re I.T. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re I.T., a Person Coming Under the Juvenile Court Law. | |
| | D081216 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J520899A) |
| Plaintiff and Respondent, | |
| v. | |
| D.E., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marissa A. Bejarano, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

D.E. (Mother) appeals from a juvenile court order terminating her parental rights to her son, I.T. (Welf. & Inst. Code,[1] § 366.26.) She contends the juvenile court erred in finding that the parental-benefit exception to the statutory preference for adoption did not apply. (§ 366.26, subd. (c)(1)(B)(i).) Because we conclude Mother has failed to affirmatively demonstrate error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Six-year-old I.T. came to the attention of the San Diego County Health and Human Services Agency (Agency) in October 2021, when the Agency received a referral that his one-year-old sister, D.E., had suffered severe physical abuse.[2] D.E. was admitted to the hospital and a child abuse expert, Dr. Nienow, opined that her injuries met the criteria for a medical diagnosis of torture. She sustained full thickness burns to multiple parts of her body, several bone fractures, severe anemia, bruising to her face, and bald spots indicative of forceful hair pulling. I.T. reported that he witnessed D.E. being burned.

D.E.'s burns covered 14.5 percent of her total body surface area. The burn pattern raised significant concerns among her treatment team that she had been intentionally scalded. Her doctors concluded the burns would likely result in profound permanent scarring because of Mother's negligence in promptly seeking medical treatment.

---

[1]     All undesignated statutory references are to the Welfare and Institutions Code.

[2]     D.E. is not the subject of this appeal and we discussed her only to provide relevant background to the issues concerning I.T.

D.E. also underwent skeletal imaging studies that revealed seven bone fractures, including to the bilateral clavicle, bilateral scapular body, and tibia and fibula injuries. The fractures were severe and would have been excruciatingly painful at the time they were inflicted. A member of D.E.'s treatment team opined that the force required to inflict these injuries could have potentially been fatal. Mother claimed she was unaware that D.E. had broken bones and did not know how they could have occurred. However, Dr. Nienow stated that D.E.'s pain responses to the fractures would have been obvious during normal caretaking activities. According to Dr. Nienow, D.E.'s broken bones were likely the result of different types of force and highly indicative of physical abuse. The scapular fractures, in particular, are "highly associated with physical abuse as they require significant blunt force trauma" to cause.

Further medical testing and observation revealed other traumatic injuries. D.E. had numerous bruises to both sides of her face, and Dr. Nienow opined the bruising was likely the result of physical abuse. Her bald spots were likely caused by forceful hair pulling and occurred before the infliction of the burns and broken bones. She was also significantly underweight and so severely anemic that she required a blood transfusion.[3] Dr. Nienow concluded that D.E. would be placed at extraordinary risk of ongoing severe abuse if she were returned to Mother's care.

Initially, Mother was not honest with D.E.'s doctors or the Agency when providing a history of D.E.'s injuries. She first reported the burns resulted accidentally during a bath at D.E.'s paternal great-grandmother's

---

[3]    D.E. was seen by a doctor at Rady Children's Hospital in July 2021 for cold-like symptoms. At that time, she was in the 80th percentile on the growth chart. Less than four months later, in October 2021, she had dropped to the 20th percentile.

home in Tijuana, Mexico. Mother said she left D.E. unattended during a bath to retrieve a towel, and she believed D.E. kicked the sink's hot water faucet on.[4] But D.E.'s treatment team believed the location of D.E.'s burns were not consistent with Mother's explanations. A detective also determined that, based on the record of Mother's travel across the United States-Mexico border, Mother was not in Mexico on the date she alleged D.E.'s burns occurred.

Mother later admitted D.E.'s burns occurred at her home in San Diego County, and not in Mexico. She disclosed that her boyfriend, B.R., gave D.E. a bath in the sink while she cooked and I.T. played a videogame in the living room. Mother heard D.E. crying from the sink and saw steam coming from the water. B.R. was sitting on the couch on his cellphone while D.E. remained in the hot water.

Mother acknowledged D.E. was likely in pain following the incident, but she decided not to seek medical care because she was afraid of the Agency's involvement. She claimed B.R. also dissuaded her from seeking treatment for D.E. Mother explained she lied about B.R.'s involvement because he had a criminal history, and she was afraid he would be blamed. B.R.'s criminal history included charges involving domestic violence and child cruelty. Although Mother initially denied that B.R. lived in her home, B.R. confirmed he had been living with Mother since September 2021.

---

[4] Mother also claimed she took D.E. to a hospital in Mexico when she noticed blisters beginning to form, but she could not provide the name or contact information for the doctor. A few days later, Mother took D.E. to a surgeon in Mexico. The surgeon informed Mother that she had second-degree burns that were bleeding abnormally, and that she was very anemic. A social worker spoke with the surgeon, who reported that he refused to treat D.E. because Mother's account of the injuries did not make sense and he suspected child abuse.

I.T. reported he had been abused by B.R. He stated that B.R. hurt him by pulling his hair, hitting him on the head, and bending his fingers outward. I.T. described B.R. as " 'crazy and bad,' " and repeatedly stated that he burned D.E. in the bathtub. Although Mother acknowledged it was possible that B.R. intentionally harmed D.E., she continued to have contact with him.

During B.R. and Mother's relationship, neighbors reported hearing a man and a woman fighting and throwing things around the apartment. One neighbor expressed concern because Mother's apartment was a small one-bedroom unit, and the children were likely exposed to the fighting. Neighbors heard children crying from the apartment at all hours of the day and night. They heard a little boy yelling, " 'don't hurt me.' "

Mother was eventually arrested for charges of torture, mayhem, and child cruelty arising from D.E.'s injuries.[5] In November 2021, the Agency filed a dependency petition alleging I.T. fell within the jurisdiction of the juvenile court because his sibling had been severely abused or neglected, and there was a substantial risk that he would be similarly abused or neglected. At the detention hearing, the juvenile court made prima facie findings on the petition and I.T. was placed in out-of-home care.

After I.T. and D.E. were removed from her custody, Mother completed both a parenting and co-parenting course. She also reported that she participated in an anger management course and began a 52-week child abuse program, although a representative from the child abuse program reported that Mother missed the first session of the course and left the second session early.

---

[5] According to the Agency's reporting, at the time of the contested section 366.26 hearing in September 2022, Mother was facing criminal charges for torture, mayhem and child abuse. The record on appeal does not reveal the disposition of the criminal case.

5

Based on the severity of D.E.'s injuries and Mother's refusal to be truthful regarding the origins of D.E.'s injuries, and the physical abuse endured by I.T. and the lasting trauma he would likely experience from observing his sibling being tortured, the Agency recommended that the juvenile court bypass reunification services. The juvenile court agreed and denied reunification services to Mother. It made a true finding on the petition and declared I.T. a dependent of the juvenile court.

At the contested section 366.26 hearing in September 2022, the juvenile court found that I.T. was generally and specifically adoptable. The court determined that Mother had failed to carry her burden of establishing that the parental-benefit exception to adoption applied. Accordingly, it terminated Mother's parental rights to free I.T. for adoption.

## DISCUSSION

Mother's sole contention in appealing the juvenile court's termination order is that the court erred by finding that the parental-benefit exception to the statutory preference for adoption did not apply. She argues the evidence "compelled" a finding that I.T. would suffer detriment from the loss of his relationship with Mother, and the court's error at the third step of the analysis "infected" its finding on the parental-benefit exception's final balancing test. We conclude Mother has not met her burden of affirmatively demonstrating error.

I.

*Section 366.26 Hearing*

At the section 366.26 hearing in September 2022, the juvenile court received in evidence the Agency's section 366.26 report and various addenda reports. The Agency presented the case social worker for cross-examination;

no other witnesses testified.  We summarize the evidence from the Agency's reports and the social worker's testimony.

In November 2021, after he was removed from Mother's custody, I.T. was placed with his paternal aunt, P.L. (Aunt).  Aunt took a twelve-week leave of absence from work when she assumed care of I.T.  A social worker observed Aunt to be attentive and caring with I.T., and that I.T. appeared comfortable with Aunt.  Aunt reported that I.T. "does very well with her, they do activities together, they go to places and he does well with routines in her home."  Aunt, who has known I.T. "all his life," was committed to adopting I.T.  I.T. said he wanted to stay in Aunt's home, though he later said he would also like to live with Mother, his maternal grandmother, and D.E.

Since March 2022, Mother and I.T. had supervised visits every Tuesdays for 90 minutes and a video call once or twice a week.  By the time of the hearing, the social worker had supervised eleven visits.  During their visits, Mother and I.T. played games and talked, and Mother often brought food and toys for I.T.  I.T. was usually "happy and excited" to see Mother, greeting her with hugs.  I.T. and Mother were affectionate with each other.  The social worker noted that "[M]other was very loving with [I.T.]"  I.T. told the social worker he enjoyed visits with Mother and that he wanted to continue them.

During one visit, I.T. told his Mother he was sad she " 'left' " him.  Mother explained she did not leave him.  When Mother told I.T. she wanted him to "come home," I.T. asked "if he would be able to go home soon."  At another visit, I.T. asked Mother "when they were going to be together," and Mother responded they would be together "in the future."  I.T. told the social worker he missed Mother, and Aunt reported that he often asked when he

7

would be able to visit with Mother again. But on one occasion, according to Aunt, I.T. did not want to attend a visit with Mother.

The social worker acknowledged "[t]here is no question that the mother and [I.T.] have a parent-child relationship."[6] But she observed that I.T. did not have any strong emotional reactions when his visits with Mother ended. He was "able to exit the visit with no emotional concerns," and would leave Mother with hugs and kisses but without crying. I.T. also did not ask for additional visits outside of their visitation schedule. "Days after the visit[s] are held, [I.T.] continues to do well with no reported emotional concerns." The social worker noted I.T. was "thriving" in his current home and that during the rest of the week, outside his visits with Mother, I.T. "is a happy and stable 6-year old who is being a kid, playing, going to school, playing on his tablet and going to the park."

The Agency also obtained information from third parties regarding Mother's relationship with I.T. His paternal grandmother reported that, throughout I.T.'s life, he stayed with her often, including on most weekends. Paternal grandmother expressed concern that I.T.'s speech was delayed, and she was unsure if Mother had pursued an assessment to address his speech. D.E.'s father alleged acts of violence by Mother, including an incident in which Mother punched him while she was driving with I.T. in the car. He also saw Mother pull I.T. by the arm and spank him when he soiled himself, and he alleged that Mother gave I.T. sleeping pills.

---

6    The social worker also observed that I.T. has on several occasions referred to Mother as "tia," which is Spanish for aunt and a reference to his current caregiver.

Mother's counsel conducted a very brief cross-examination of the social worker.[7]  The social worker testified Mother has never "displayed any bad parenting" during her visits.  I.T. was generally excited to see Mother and he had "a couple times" expressed his desire to return to Mother's care.  Although I.T. was sad when his visits with Mother ended, the social worker believed he was sad because "he want[ed] to keep playing."  On redirect, the social worker explained I.T. did not express sadness because Mother was leaving.  He had also not expressed any distress when he learned visits were cancelled.

The social worker had tried to explain to I.T. "there is a potential he might never have visits with his mom again," and his response—"Okay"—suggested to her that I.T. has a hard time understanding "forever" and "adoption."  The social worker expected I.T. to experience sadness if Mother's parental rights were terminated, but she did not believe he would suffer in the long term.  She explained that since his placement with Aunt, he has experienced stability and was doing well.  She concluded that adoption was in I.T.'s best interest despite the sadness he may experience at the discontinuation of visitation with Mother.

The Agency conceded the evidence demonstrated that Mother and I.T. shared a parent-child relationship with positive attributes.  But it was the Agency's opinion that the benefits of adoption outweighed any detriment I.T. would suffer if the relationship was severed.  The Agency emphasized that I.T. did not get upset when his visits with Mother were cancelled.  It also asserted that Mother presented no evidence that I.T. would suffer detriment if their relationship was terminated, or that the benefits of adoption would

---

7    Cross-examination of the social worker filled five pages of the reporter's transcript.

not outweigh any such detriment. In contrast, I.T. had made demonstrable progress in a stable home with Aunt. Counsel for I.T. joined in the Agency's arguments that Mother's parental rights should be terminated to free I.T. for adoption.

Mother's counsel argued there was "an extraordinarily strong bond" between Mother and I.T., and the court should not terminate her rights because the parental-benefit exception applied. She emphasized that I.T., who had just turned 7 years old two days earlier, had spent over five years of his life in Mother's care. Counsel argued I.T. was too young to understand "he may not see his mother ever again" and "voice a bar to adoption." And although Aunt reported that I.T. was not upset when his visits with Mother were cancelled, under those circumstances I.T. presumably knew there would be another visit.

The juvenile court found clear and convincing evidence established that I.T. was generally and specifically adoptable. It then turned to "the true issue before the court" and that is whether the parental-benefit exception applied, noting that it does so only in "exceptional circumstances." It correctly observed the exception required Mother to prove by a preponderance of the evidence three elements: "First, there has been regular visitation and contact. Two, that there [is] a relationship with the parent, [the] continuation of which would benefit the child such that, three, the termination of parental rights would be detrimental to the child."

The court agreed with the parties that the first and second elements of the exception had been established by the evidence. It found there had been regular visitation and contact, and the relationship between Mother and I.T. was "a significant one," which if continued would benefit the child.

10

The juvenile court turned to the third element to determine "whether it would be detrimental to the child to sever the relationship [with Mother] and choose adoption, when balanced against the benefits of a new adoptive home." Here, the court found the only evidence Mother presented on detriment from termination of the parent-child relationship was that I.T. "would be sad." And it agreed with the Agency that this was not a sufficient showing of detriment by Mother. The court found there was evidence that I.T. "continue[d] to move forward in his life," in Aunt's home and care, when "there are no visits" with Mother. For example, he is able to go to school and "do well," he has "supports in place," and "there is no significant distress or other emotional behavior" by I.T.

The court concluded Mother failed to demonstrate termination of her relationship with I.T. would be detrimental to him, and even assuming detriment, it concluded the benefits of adoption would outweigh any detriment because I.T. "would benefit from the stability and permanency that adoption would provide to him." The court terminated Mother's parental rights to free I.T. for adoption.

## II.

*Mother Has Failed to Affirmatively Demonstrate the Juvenile Court Erred*

A section 366.26 hearing is "designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 52–53.) At this stage of a dependency case, the juvenile court must choose one of three permanent plans: adoption, guardianship or long-term foster care. (§ 366.26, subd. (b).) Of these options, "[a]doption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*);

11

§ 366.26, subd. (c)(1) [When the court finds by clear and convincing evidence the child is adoptable, "the court shall terminate parental rights and order the child placed for adoption" unless a statutory exception applies].) The parent has the burden of showing the termination of parental rights would be detrimental to the child under one of the exceptions to adoption. (See *In re Fernando M.* (2006) 138 Cal.App.4th 529, 534 (*Fernando M.*).)

One of the statutory exceptions to the preference for adoption is the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) This exception applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child," including where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1), (B)(i).) There are three elements a parent must prove, by a preponderance of the evidence, "to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).) A "crucial aspect of the [juvenile] court's responsibility" at the section 366.26 hearing is deciding "whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.] By making this decision, the [juvenile] court determines whether terminating parental rights serves the child's best interests." (*Caden C.*, at pp. 631–632.)

Here, the juvenile court found the evidence established the first two elements. Since the Agency does not dispute these findings, we shall focus our analysis on the third element, noting however that the second and third elements of the exception "significantly overlap." (*In re Katherine J.* (2022)

75 Cal.App.5th 303, 317, fn. 7.) "For example, evidence that terminating the parental relation would cause harm indicates that child would lose important relational benefits if severed from her parent." (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C., supra*, 11 Cal.5th at pp. 633–634.)

This third element—whether termination of parental rights would be detrimental to the child—is the most difficult question for the juvenile court to resolve. Where the court has found that regular contact and visitation have continued, and that this contact has created a relationship that benefits the child, the court must "decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 632, citing *Autumn H., supra*, 27 Cal.App.4th at p. 575.) As our Supreme Court explained, determining the "harm associated with severing the relationship is a subtle enterprise." (*Caden C.*, at p. 634.) A parent-child relationship sometimes "involves tangled benefits and burdens" and "[i]n those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Ibid.*)

We review a juvenile court's "ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but *its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion.*" (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068, italics added; accord *Caden C., supra*, 11 Cal.5th at pp. 639–640.) As our high court explained in *Caden C.*, "[a]t its core, the hybrid standard . . . simply embodies

13

the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, at p. 641.) It is well established that a court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Ibid.*)

Reviewing the court's factual determinations for substantial evidence, " 'we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*In re R.T.* (2017) 3 Cal.5th 622, 633.) We uphold the judgment if it is supported by substantial evidence, "even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 230.)

A parent challenging the sufficiency of the evidence on appeal assumes a difficult burden, as it "is generally considered the most difficult standard of review to meet." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 595.) Additionally, as Mother herself acknowledges in her opening brief on appeal, this burden is even weightier where, as here, the issue on appeal turns on a failure of proof by the party who bore the burden of proof. In such a case, under the substantial evidence standard, the question "for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law" or, put another way, "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight

as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

We agree that Mother and I.T. share a significant relationship, and that its continuation would benefit I.T. It is obvious that Mother and I.T. have a strong and loving bond, and Mother's trial counsel was correct that this is not the case of an infant who has had limited interactions with a parent. I.T. had just turned seven years old and, although he spent significant time in the care of other family members all his life, his relationship with his Mother took root.

However, Mother had the burden of proof to affirmatively demonstrate that termination of the relationship would be detrimental to I.T. (*Fernando M., supra*, 138 Cal.App.4th at p. 534.) Here, the juvenile court found the only evidence Mother presented to show detriment was that I.T. "would be sad" from the loss of the relationship, and that was not a sufficient showing. Mother did not present any affirmative evidence, and her cross-examination of the social worker was very brief, highlighting only that I.T. was generally excited to see Mother; he had on a few occasions expressed his desire to return to Mother's care; and that he was "sad" when visits ended with Mother. On the facts of this case, we agree with the juvenile court this was an insufficient showing of detriment.

As our sister court stated in a case involving the sibling bond exception under section 366.26, subdivision (c)(1)(E), "we do not believe that a child's 'sadness' can *never* satisfy the substantial detriment test. 'Sadness' is often all a young child can express. While an adult witness might be able to differentiate between, 'This will make me sad, but I can deal with it,' and 'This will devastate me; I can't imagine life without my sibling and I don't think I want to live without him or her,' a child is likely to describe both as

15

making him, 'sad.' " (*In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1017, italics added, disapproved on other grounds in *In re S.B.* (2009) 46 Cal.4th 529, 537.)  But "never" does not mean always, and whether a child's sadness is indicative of substantial detriment is case-specific.  (Cf. *Jacob S.*, at pp. 1015, 1017–1018 [11- and 14- year old sisters, who lived their entire lives together, "confided in one another and assumed leadership roles at a very young age when their mother was unable to take care of them or their brothers"; under those circumstances, 11-year old sibling's expression that "she missed [her sister] very much and would be very sad if she never saw [her] again" likely indicates she would suffer detriment if she never saw her older sister again].)

In this case, although I.T. was sad when some visits ended and he expressed that he missed Mother, the juvenile court also found I.T. experienced "no significant distress or other emotional behavior" when "there are no visits" with Mother.  The focus of the third element of the parental-benefit exception is on the harm to a child in severing his or her relationship with a parent and choosing adoption.  (*Caden C., supra*, 11 Cal.5th at p. 633.)  Here, the juvenile court must determine "how the child would be affected by losing the parental relationship—in effect, *what life would be like for the child in an adoptive home without the parent in the child's life*" (*ibid.*, italics added).  In that respect, the court found rather than experiencing distress when he was without Mother, I.T. "continue[d] to move forward in his life," in Aunt's home.  Substantial evidence supported the court's factual findings. The social worker testified, based on her observations of 11 supervised visits, that I.T. did not have any strong emotional reactions when his visits with Mother ended, and days after the visits are held, he "continue[d] to do well with no reported emotional concerns."  To the contrary, I.T. was "thriving," and was a "happy and stable 6-year old" in his current home with Aunt.  The

16

social worker testified that since the start of the dependency case, I.T. had adjusted to life with Aunt whom he had known for his entire life.

On the record before us, we cannot say that the evidence compels a finding in favor of Mother on detriment, as a matter of law. Substantial evidence supported the juvenile court's factual determinations on the third element of the parental-benefit exception to adoption. But even assuming Mother met her burden of showing detriment, we conclude the juvenile court was well within its discretion to find that the benefits of a stable adoptive home outweighed any harm from termination of the parental relationship.[8]

In the last step of the analysis, the juvenile court must examine whether "the benefit of placement in a new, adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with' " the parent. (*Caden C., supra*, 11 Cal.5th at p. 633.) Relevant here, I.T. was exposed to severe violence inflicted on his younger sister by Mother's boyfriend. Mother had also failed to protect I.T. from physical abuse by the same perpetrator. The trauma he experienced required I.T. to attend weekly therapy. But his prospective adoptive parent ensured that he consistently attended therapy to address his needs, and she maintained a safe home environment. In that stable environment, outside of Mother's care, I.T. made demonstrable progress, his speech improved, and it was reported that he did well in school. He was in fact said to be "thriving."

Our focus on Aunt's home environment is not to compare Mother's parental attributes with that of Aunt (*Caden C., supra*, 11 Cal.5th at p. 634

---

8      Mother argues the court's final balancing of the relative harm and benefits from the termination of the parental relationship was "infected" by its erroneous finding that I.T. would not experience detriment. Although we find no such error, the juvenile court assumed detriment in performing the final balancing. The court expressly stated it "finds that the benefits of adoption would outweigh *any detriment.*"

["[w]hen it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)"]), but to see into what I.T.'s life looks like in his prospective adoptive home, without a parental relationship with Mother. At this step, the juvenile court is required to "determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance" the harm in terminating parental rights. (*Id.* at p. 640.) We perceive no abuse of discretion in the court's determination that for I.T., the permanency and stability that adoption would give him would outweigh any detriment he might experience from termination of his relationship with Mother. We conclude the determination was not arbitrary, capricious, or patently absurd. (See *id.* at p. 641.)

In sum, we conclude Mother has not met her burden on appeal of affirmatively demonstrating error in the court's order terminating parental rights. So we shall affirm.

DISPOSITION

The order terminating Mother's parental rights is affirmed.

DO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

DATO, J.

18